[Cite as *In re L.E.*, 2022-Ohio-624.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| IN RE: L.E. | : | Hon. W. Scott Gwin, P. J. |
| L.E. | : | Hon. Patricia A. Delaney, J. |
| L.E. | : | Hon. Craig R. Baldwin, J. |
| L.E. | : |  |
|  | : | Case No. 2021 CA 0032 |
|  | : | 2021 CA 0033 |
|  | : | 2021 CA 0034 |
|  | : | OPINION 2021 CA 0035 |

CHARACTER OF PROCEEDING:      Civil appeal from the Richland County Court of Common Pleas, Juvenile Division, Case Nos. 2018DEP00206, 2019 DEP 00098, 2019DEL 00242 & 2019 DEP 00099

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      March 3, 2022

APPEARANCES:

For Plaintiff-Appellee

CHRISTOPHER ZUERCHER
TIFFANY BIRD
Richland County Childrens Services
731 Scholl Rd.
Mansfield, OH 44907

For Defendant-Appellant

BRIAN A. SMITH
123 South Miller Road, Suite 250
Fairlawn, OH 44333

*Gwin, P.J.*

{¶1}   Appellant-Father ["Father"] appeals the April 19, 2021 Judgment Entry of the Richland County Court of Common Pleas, Juvenile Division, which terminated his parental rights with respect to his four minor children[1] and granted permanent custody of the children to appellee, Richland County Children Services (hereinafter "RCCS").

*Facts and Procedural History*

{¶2}   Mother[2] and Father are the biological parents of Child 1, b. 08.20.2004, Child 2, b. 08.22.2006, Child 3, b. 09.25.2007 and Child 4, b. 06.02.2011[3].  Mother and Father are not married to each other. Mother is currently married to D.N.

{¶3}   Child 1 was found to be a delinquent child and a temporary order of temporary custody was issued on July 16, 2019. 1T. at 444-445.[4] Child 1 was subsequently placed in the temporary custody of RCCS by order filed October 10, 2019. 1T. at 445.  These orders were filed under the delinquency case number 2019-DEL-00242.  Id.  *See, also,* Court Exhibit B.

{¶4}   The case involving Child 2 was commenced with the filing of a Complaint on November 1, 2018. Child 2 was found to be a dependent on August 14, 2019 and was placed in the temporary custody of RCCS by Judgment Entry filed September 4, 2019. 1T. at 443-444; Court's Exhibit A.

---

[1] Because the four children's initials are identical, in this Opinion the children will be referred to by number with the oldest child being Child 1 and the youngest child being Child 4.

[2] For the Mother's appeal, see, *In re L.E.*, 5th District Richland Case Numbers 2021CA0025, 2021CA0026, 2021CA0027 and 2021CA0028.  The instant appeal focuses upon those facts relevant to Father's efforts to challenge the motion for permanent custody.

[3] See, OH ST Supp. R. 44(H) and 45(D) concerning the use of personal identifiers

[4] For clarity the transcript of the Permanent Custody hearings that took place on March 22, April 5, 8, 9 and 12 in the trial court will be referred to as "__T.__, signifying the volume and the page number.

{¶5}   The case involving Child 3 was commenced with the filing of a Complaint on May 16, 2019. 1T. at 446; Court's Exhibit C. Child 3 was found to be a dependent child on August 14, 2019 and was placed in the temporary custody of RCCS on September 4, 2019.  1T. at 450; Court's Exhibit C.

{¶6}   The case involving Child 4 was commenced with the filing of a Complaint on May 17, 2019. 1T. at 445-446; Court's Exhibit D.  Child 4 was found to be a dependent child on August 14, 2019 and was placed in the temporary custody of RCCS on September 4, 2019.  1T. at 450; Court's Exhibit D.

{¶7}   The allegations of dependency as to Father in the Complaint were: Father's need for psychological evaluation; school attendance; eliminating negative talk regarding mother; and, obtain a larger home.

{¶8}   Case plan objectives for Father included that he was required to obtain individual counseling, anger management, and parenting skill training. 1T. at 454; 538.

{¶9}   On February 28, 2020 Father filed a Motion for Legal Custody of the children. On September 30, 2020, RCCS filed a Motion for Permanent Custody of the children. A hearing on the motions was conducted by the trial court on March 22, April 5, April 8, April 9, and April 12, 2021. Mother chose to attend only the April 9, 2021 hearing. 1T. at 191; 389; 627-628; 877. The following evidence was presented during the hearings.

**The needs of the children**

{¶10}  In July 2019, delinquency charges were filed against the two eldest girls, Child 1 and an older sibling who is not a subject of the case at bar for stealing their Mom's vehicle and wrecking it. *Report of guardian ad litem,* Mar 16, 2021 at 14; Court's Exhibit E. Child 1 participated in a psychiatric evaluation at Catalyst Life Services on June 17,

2020. 1T. at 258-259. Child 1 reported that she had been participating in counseling every two weeks. RCCS Exhibit E. Child 1 suffers from depression, anxiety, and post-traumatic stress disorder.  1T. at 259-260.  She has had suicidal ideation in the past, and has cut herself. She reported she presently has no suicidal thoughts. 1T. at 261; RCCS Exhibit E. She had been physically abused by her father. Child 1 has made some progress in therapy. She was prescribed Lexapro. 1T. at 262.

{¶11} Child 2 attended Catalyst Life Services and participated in an initial psychiatric evaluation on November 6, 2019.  1T. at 277.  Child 2 was diagnosed with Attention Deficit Hyperactivity Disorder. 1T. at 38. Concerns with Child 2 include attention span, profanity at school, not staying on task, starting fights and declining grades. 1T. at 38. It was reported that Child 2 had problems with an 8 year old boy in his foster placement. 1T. at 60.

{¶12}  On June 27, 2019, Child 3 was initially diagnosed with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct. 1T. at 202. On August 29, 2019, Child 3's diagnosis was changed to Oppositional Defiant Disorder. 1T. at 203.  Child 3 is an extremely angry child. She is disrespectful toward adults, obstinate and purposefully defiant. 1 T. at 205-208; RCCS Exhibit C.  Child 3 is unwilling to accept any blame for her behavior. She is reactive to this anger through the learned behaviors she has witnessed throughout her life. RCCS Exhibit C. Child 3 has been unsuccessful in the home environment, foster placements and in school. RCCS Exhibit C.  Child 3 indicated that she worries about her mother. 1T. at 209. Child 3 does not like either her Father or her step-father. Id.

{¶13}   Child 4 has been diagnosed with General Anxiety Disorder, Post-Traumatic Stress Disorder, Oppositional Defiant Disorder and Pica which refers to the eating of non-nutritive substances. 1T. at 231-233.  She is defiant to her foster parent and counselor. 1T. at 234. Child 4 tears things, throws things, is rude, disrespectful and engaged in fighting at school. 1T. at 234-235. Child 4's behavior did not improve with counseling. 1T. at 239; RCCS Exhibit D.

### Father's mental health evaluation

{¶14}   Dr. Aimee Thomas a psychologist and licensed professional clinical counselor for Lighthouse Family Center met with Father on November 15, 2019. 1T. at 24. Dr. Thomas completed Father's parenting evaluation report on January 21, 2020. RCCS Exhibit B; 1T. at 24-25.

{¶15}   Father reported that he has 22 children; however, he only agreed to provide information about the eight children who resided in Mansfield, four of which are the children involved in this case. 1T. at 55-56; RCCS Exhibit B. Father insisted that he paid child support in full for all of his children. 1T. at 56; RCCS Exhibit B.

{¶16}   Father reported that he previously had placement of an older sibling not involved in the present case until she began running away from his residence. RCCS Exhibit B. Child 1 also repeatedly ran away from home. Specifically, Child 1 repeatedly snuck out of Father's residence and engaged in sexual relationships with her male partners. Child 2 and Child 3 were placed in a foster home because of their disruptive and violent behaviors.  Child 4 was placed in a foster home in Mansfield.

{¶17}   Father attributed all of the children's behavioral problems to Mother. 1T. at 51. Father assumed no responsibility for the behavior of the children. Id. Father reported

that violence had taken place between him and Mother and the children were exposed to the violence. 1T. at 56.  Father admitted that the children witnessed him restrain Mother and dislocate her shoulder. 1T. at 58. Father was convicted of Domestic Violence. 1T. at 58.

{¶18}   Father reported that he earned his high school diploma while in prison. 1T. at 57.  Father also reported that he attended Penn State and earned degrees in law and psychology.  1T. at 57. He claimed to have attended Penn State for four years during which he earned his juris doctorate degree. Id.

{¶19}  Father denied having an alcohol or drug problem. 1T. at 57.

{¶20}  Father was charged with Criminal Conspiracy, Aggravated Assault and Felonious Assault as an adolescent, but insisted that these charges were dismissed. As an adult, Father was convicted of Child Endangering and Assault. RCCS Exhibit B.

{¶21}  Dr. Thomas reviewed the mental health records of the children as part of her assessment. 1T. at 34. Dr. Thomas concluded that the behavior of the children pre-dated the grant of temporary custody to RCCS. 1T. at 39. In other words, the children's home environment contributed to the behavioral problems of the children.

{¶22} Dr. Thomas diagnosed Father as Narcissistic Personality Disorder. Additionally, there was a delusional quality to his grandiosity. For instance, Father either exaggerated or completely fabricated his education history. He reported that he attended Penn State for four years and earned his Juris Doctorate. Father further insisted that he was acquainted with individuals who had developed psychological tools and inventories used by Dr. Thomas. He asserted that he is always right and is "undebatable" because he has an answer for everything. Dr. Thomas opined that unfortunately, these narcissistic

manifestations will interfere with Father's ability to empathize with other people's experiences, including his children.   He has unrealistic expectations for his children, and he disregarded how his lifestyle choices have contributed to their behavioral problems. 1T. at 62-66; RCCS Exhibit B.

{¶23}  Dr. Thomas recommended Father participate in individual counseling with the goal of addressing challenging aspects of his personality, educating him about child development, and developing anger management strategies. Ideally, counseling will increase his ability to empathize with the experience of others, including his younger children. However, Dr. Thomas has little confidence that any changes will occur, even with the support of intensive counseling. 1 T. at 66-68; RCCS Exhibit B.

{¶24}  Dr. Thomas further recommended Father participate in parenting skill training for adolescents with behavioral problems. Dr. Thomas opined, Father is likely to disregard any parenting skill training that contradicts his perceptions of appropriate parenting practices. Nevertheless, attempts should be made at improving or increasing Father's understanding of child development. 1T. at 66-67; RCCS Exhibit B.

{¶25}  Finally, Dr. Thomas would recommend that the RCCS monitor Father's interactions with his children during visitation. If problems with patience or anger management are observed, it is recommended that he participate in anger management group treatment. On-line programs are not acceptable. 1T. at 67-68; RCCS Exhibit B.

### Father's interaction with the children.

{¶26}  On May 31, 2019, the trial court entered an order limiting the contact between the minor children and the parents due to a long history of the parents coaching and/or threatening the children regarding their communication to third parties. Visitations

were set at the agency and neither parent was to have contact/communication with the children outside of their visits.

{¶27}  Father obtained a civil protection order against Mother on July 11, 2019 that included a provision of no contact with the children, except as provided by the Court. The CPO was obtained because Mother threw a brick at Father's car while he and the children were in the car. GAL Exhibit 1.

{¶28}  A chaotic event occurred during a meeting at the trial court with Mother, Father, Child 3, Child 4 and agency staff during February of 2021. During that meeting, Mother and the two girls began yelling at Father, and he reciprocated. Security came to the room to quell the disturbance and ensure there was no harm caused to anyone. 1T. at 468-469.

{¶29}  When Child 2's teacher met with Father regarding his schooling, the father "began talking about himself right away." Father continually talked about himself at the meeting, including mention of his IQ of 170 and his law degree. Father did not cause Child 2 to go to school, do school work at home, or improve his behavior at school. Father has not been involved in Child 2's schooling, nor was there any evidence that he has helped Child 2 overcome his anti-social behaviors. Father's interaction with Child 2 has mainly involved sports, video games, Godzilla, and dinosaurs.

{¶30}  After visits with the father, the children acted out in their foster placements. Child 3 would become more disruptive after visiting with Father. 1T. at 482; 546.

{¶31}  There was no evidence that Father or Mother parented the children to not threaten others or not use profanity towards others.

**Father's testimony**

{¶32}   Father brought his small daughter from a subsequent relationship to several of the permanent custody hearings claiming to have no one to watch her. 1T. at 6-7; 192. Father admitted that he has allowed Mother to watch this child. 1T. at 106-107.

{¶33}   Father vehemently disagreed with Dr. Thomas' definition of "narcissistic." 1T. at 108-109. When asked if he had a law degree Father confused the issue, while admitting that he never attended Penn State and did not have a law degree. 1T. at 110-111. Father denied ever telling Dr. Thomas that he had earned a juris doctorate degree. 1T. at 111.  He further claimed to be joking when he told Dr. Thomas that he had fathered 22 children. 1T. at 117.

{¶34}   Father admitted that he had spent a year in prison after being convicted of child endangering for physically assaulting an older sibling of the children. 1T. at 129-130.

{¶35}   Father continued to blame Mother for the children's behaviors. 1T. at 131-136; 165. Father further testified that the FBI is investigating RCCS and their attorney for allegedly refusing to provide Father with educational records of the children. 1T. at 154-156.  Father could produce no documentation or names of anyone involved in the alleged investigation. 155-156. Father refused to name the hundreds of federal agencies he claims to have contacted, because the agencies told him that he is not required to name them due to their ongoing investigation. 1T. at 156-158.

{¶36}   Father testified that RCCS agreed that he should have custody of his four-year-old daughter from a subsequent relationship. 2T. at 894.

**Father's counseling**

{¶37} Father began seeing Chris Childers a licensed professional counselor at Heritage Christian Counseling Ministries March 19, 2020. 1T. at 505-506. The sessions were conducted via telephone. Childers never physically met Father until Childers testified in this case. 1T. at 508-509. When offered the opportunity to conduct face-to-face counseling sessions, Father preferred to continue counseling over the telephone. 1T. at 517.

{¶38} Childers diagnosed Father with depression. 1T. at 506-507; 510-511. Childers' diagnosis was based entirely upon his conversations with Father. Id. Childers conducted no psychological testing with Father. 1T. at 511. Childers did not review Dr. Thomas's evaluation. 1T. at 513.

{¶39} Childers admitted that he was offering Father emotional support as opposed to any real counseling to address Father's mental health issues. 1T. at 524; 530; 533-534. Childers did not address Fathers case plan, anger management, or parenting education. 1T. at 528-529. Childers admitted that he was not involved in helping the Father change whatever negative character attributes he may have. 1T. at 535.

{¶40} The case notes related to Father's counseling reveal his continued frustration with "the system" and with being treated badly because he is a "black man." To the counselor he further objected to being told how to parent. The case progress notes reveal the counselor took notes on Father's frustration with the system, and also that he made no efforts to help him make progress on his mental health issues.

{¶41} Mary Stephan an employee of the Parent Aide program testified that Father voluntarily came to the program in 2019. 1T. at 395. Stephan testified that Father did

make some progress in uncluttering his home. 1T. at 409. Stephan noted that at first Father would refer to the children by foul names such as "whores." 1T. at 400; 409-411.

{¶42} Father told Stephan that he had done social work in the past and had other individuals working beneath him when he lived in Pennsylvania. 1T. at 402. Stephan characterized this as a problem because when someone says they can do your job it gives the impression that person is unteachable. 1T. at 422. Father felt as though he knew all the answers. 1T. at 429.

{¶43} Stephan reported that Father would "blow up" in meetings. 1T. at 403. She felt Father struggled with being a proper role model for his children. Id. Father further struggled in being consistent in setting healthy boundaries. 1T. at 406.

{¶44} Stephan saw limited improvement in Father's progress. 1T. at 420; 427; 429. RCCS Exhibit H. Although Father did complete the program, in Stephan's opinion he did not complete the program successfully. 1T. at 430.

{¶45} Father has not completed an Anger Management program. 1T. at 466.

### Father's employment and housing

{¶46} Father lives in a two-bedroom home. 2T. at 880. Father admitted that housing was an issue for RCCS. 2T. at 932. In late 2019, Father was given the opportunity to work with Catholic Charities to obtain a larger home. 1T. at 471-472. Father testified that he was he was the one that went to Catholic Charities, not RCCS. 2T. at 932-933. Father testified he accepted over $1700.00 from Catholic Charities to become current in the lease on his current home. Father testified that he is at the top of the list for Metropolitan Housing. 2T. at 936-937; Father's Exhibit 1.

{¶47} Father testified that he has driven a cab in the Mansfield area off and on for over twenty-five years. 2T. at 880. However, Father is currently unemployed. 2T. at 881.

## Placement of the Children

{¶48} Child 1 and Child 4 are currently in different foster placements in Mansfield, near Father's home. Child 3 is in a foster placement in Upper Sandusky. Child 2 is in a foster placement in Dayton.

{¶49} Child 2 and Child 3 have been placed in other cities in Ohio because they disrupted their foster home placements. Child 2 previously threatened to push a foster parent down the stairs. Child 3 has been placed elsewhere because of choking a person. Child 3 has been in five different placements. Child 1 and Child 4 have been in their respective placements for over a year.

{¶50} The fact that the children were placed in different locations has made visitation for the Father difficult to achieve. On occasion he drove 7 hours one way to pick up his children, and the same amount of time to return them after visitation. The agency has offered modest help with transportation cost.

## Recommendations

{¶51} The guardian ad litem has investigated this case and the circumstances of the children, has participated in this case and has filed a written report with the Court. The GAL recommends that the children should be placed in the permanent custody of RCCS and that such an order would be in their best interest. 2T. at 607; Court's Exhibit E.

{¶52} The ongoing caseworker in this matter, based upon her testimony, is of the opinion that all the children should be placed in the permanent custody of RCCS, and that such an order would be in the children's best interest. 1T. at 566-567.

**Entry granting permanent custody**

{¶53} The trial court found by clear and convincing evidence pursuant to R.C. 2151.414(B)(1)(d) that each child was in the temporary custody of RCCS for more than 12 consecutive months of a 22-month period of time.

{¶54} In the alternative, the Court found by clear and convincing evidence that the children cannot be placed with either of his parents within a reasonable period of time, and should not be placed with such parents pursuant to R.C. 2151.414(B)(1)(a), R.C. 2151.414(D), (E)(1) and (E)(4), specifically citing the parents' failure to remedy the problems that initially caused each child to be placed outside the home. The trial court noted,

> Both parents have mental health issues that make a return to either parent contrary to the best interests of each child. Their mental health issues have created chaos for the children and modeled anti-social behavior patterns that the children have also exhibited. There is no reason to believe that the parents have remedied the problems that led to the removal of their children. If the children were placed with either parent, it is most likely that the children's behavior would deteriorate again.

{¶55} The trial court found Father had not made significant progress on his case plan. Further, the trial court noted "Father failed to obtain counseling directed towards addressing his narcissistic personality disorder; the adverse effect his disorder had on being attentive to the children's needs, particularly in school and behaviorally; his continual bad-mouthing of mother in the children's presence; his failure to assist the children in school and in over-coming their anti-social behaviors; failure to obtain

assistance in parenting due to his belief that he knows it all. His coaching the children and thwarting the guardian's efforts to ascertain the children's best interests; his failure to protect the children from their mother and her husband, and other incidents identified in the findings of fact." The juvenile court further noted Father's failure to remedy the conditions that caused the children to be removed from the home.

Assignments of Error

{¶56} Father appeals raising two Assignments of Error,

{¶57} "I. THE TRIAL COURT'S RULINGS IN CASE NUMBERS 2019 DEP 00098, 2018 DEP 00206, 2019 DEP 00099, AND 2019 DEL 00242, GRANTING APPELLEE'S MOTION FOR PERMANENT CUSTODY, WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶58} "II. THE TRIAL COURT DID NOT HAVE JURISDICTION UNDER R.C. 2151.413 AND R.C. 2151.414, IN CASE NUMBER 2019 DEL 00242, TO GRANT APPELLEE'S MOTION FOR PERMANENT CUSTODY WITH RESPECT TO [CHILD 1], BECAUSE [CHILD 1] HAD NOT BEEN ADJUDICATED AS AN ABUSED, NEGLECTED, OR DEPENDENT CHILD."

I.

**Standard of Appellate Review**

{¶59} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), *quoting Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972). A parent's interest in the care, custody and management of his or her child is "fundamental." Id.; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982). The permanent termination of a parent's

rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith,* 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist. 1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." Id. An award of permanent custody must be based upon clear and convincing evidence. R.C. 2151.414(B)(1).

{¶60} The Ohio Supreme Court has delineated our standard of review as follows, "clear and convincing evidence" is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986). In *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E. 2d 118 (1954), the Supreme Court further cautioned,

> The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the*

*truth and what should be rejected as false.* See *Rice v. City of Cleveland,*

114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478. (Emphasis added). A court of appeals will affirm the trial court's findings "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re Adkins,* 5th Dist. Nos. 2005AP06–0044 and 2005AP07–0049, 2006-Ohio-431, 2006 WL 242557, ¶17.

**Requirements for Permanent Custody Awards**

{¶61} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶62} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as

described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶63} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**The child had been in the temporary custody of the agency for a period more than twelve of the prior twenty-two consecutive months – R.C. 2151.414(B)(1)(d).**

**{¶64}** Before a public children-services agency or private child-placing agency can move for permanent custody of a child on R.C. 2151.414(B)(1)(d) grounds, the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22–month period. *In re: C.W.,* 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176 at paragraph one of the syllabus. When calculating this period, the court in *C.W.* cautioned, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12–month period set forth in R.C. 2151.414(B)(1)(d)." Id. at 167, 2004-Ohio-6411 at ¶ 26, 818 N.E.2d at 1180. *Accord, In re: N.C.*, 5th Dist. No. 2011-CA-00141, 2011-Ohio-6113, ¶32.

**{¶65}** As we have previously noted in our review of the procedural history of these cases, the record establishes that each child had been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months at the time the permanent custody motion was filed. 1T. at 443-450. Child 1 has been placed out of their home for the last 21 months; Child 3 and Child 4 have been placed out of the home for the last 19 months; Child 2 has been placed out of the home for the last 18 months.

**{¶66}** As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Daltoni*, 5th Dist. Tuscarawas No. 2007 AP 0041, 2007-Ohio-5805. This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun*, 5th Dist. Stark No. 2008CA00118, 2008-Ohio-5458.

{¶67} Because Father has not challenged the twelve of twenty-two-month finding as to the children, we would not need to address the merits of Father's assignment of error. However, even if we consider Father's arguments the trial court did not err in determining the children cannot be placed with Father at this time or within a reasonable period of time.

**Parental Placement within a Reasonable Time– R.C. 2151.414(B)(1)(a).**

{¶68} The court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151.414(E). The statute also indicates that if the court makes a finding under R.C. 2151.414(E)(1)-(15), the court shall determine the children cannot or should not be placed with the parent. A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. *See In re William S.*, 75 Ohio St.3d 95, 1996–Ohio–182, 661 N.E.2d 738; *In re Hurlow*, 4th Dist. Gallia No. 98 CA 6, 1997 WL 701328 (Sept. 21, 1998); *In re Butcher,* 4th Dist. Athens No. 1470, 1991 WL 62145(Apr. 10, 1991).

{¶69} R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of  division (A)(4) of section 2151.353 of the

Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties.

\* \* \*

(16) Any other factor the court considers relevant.

{¶70} As set forth above, the trial court's findings are based upon competent credible evidence. The record includes the recommendation of the guardian ad litem for the children, and the testimony of the witnesses at trial. The trial court was in the best position to determine the credibility of the witnesses.

{¶71} In the case at bar, Father has consistently and vocally refused to accept any responsibility for his children's poor behavior.  Father has shown little interest in working with RCCS or anyone to reunify with his children. Father continually blames Mother for his and his children's situation.  Despite offering numerous services, Father was unable or unwilling to mitigate the concerns that led to the children's removal. The juvenile court found that Father "offered significant amounts of false, misleading, or unbelievable testimony. He attempted to portray himself as a peaceful man where the children feel safe. He attempted to portray himself as one who admits his mistakes and attempts to change for the better."

{¶72} A parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification.  The ultimate question under R.C. 2151.414(A)(1) is whether the parent has substantially remedied the conditions that caused the child's removal.  *In re Shchigelski*, 11th Dist. Geauga No.  99–G–2241, 2000 WL 1568388(Oct. 20, 2000); *In re McKenzie*, 9th Dist. Wayne No. 95CA0015, 1995 WL 608285(Oct. 18, 1995).  A parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed—the case plan is simply a means to a goal, but not the goal itself.  Hence, the courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency.  *In re J.L.,* 8th Dist. No. 84368, 2004–Ohio–6024, ¶ 20; *In re*

*Mraz*, 12th Dist. Nos. CA2002–05–011, CA2002–07–014, 2002–Ohio–7278. In the case of *In re: Summerfield*, 5th Dist. Stark No. 2005CA00139, 2005-Ohio-5523, this Court found where, despite marginal compliance with some aspects of the case plan, the exact problems that led to the initial removal remained in existence, a court does not err in finding the child cannot be placed with the parent within a reasonable time.

{¶73} The evidence demonstrated the very little successful efforts Father had made on the case plan. On that point, the evidence demonstrates that any improvement that Father has made in his life is tentative and, perhaps, temporary, and that he is at risk of relapse. The trial court found that, regardless of Father's compliance with aspects of his case plan, he was still not able to be a successful parent to these children.

{¶74} We find there is competent and credible evidence to support the trial court's determination that the children cannot be placed with Father within a reasonable time or should not be placed with Father.

**Reasonable Efforts**

{¶75} The Supreme Court of Ohio in In *re C.F.*, 113 Ohio St. 3d 73, 78, 862 N.E. 2d 816, 821(2007) noted,

> [N]o one section of the Revised Code addresses the concept of reasonable efforts. Overall, Ohio's child-welfare laws are designed to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.' R.C. 2151. 01(A). To that end, various sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit. For example,

R.C. 2151. 412 requires the agency to prepare and maintain a case plan for children in temporary custody with the goal 'to eliminate with all due speed the need for the out-of-home placement so that the child can safely return home.' Under R.C. 2151.413(D)(3)(b), an agency may not file for permanent custody under R.C. 2151. 413(D) - the '12 months out of 22 rule'-'[i]f reasonable efforts to return the child to the child's home are required under section 2151. 419' and the agency has not provided the services required by the case plan.

{¶76} A "reasonable effort" is "* * * an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011(12th Dist. 1992). The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. *In re J.D.*, 3rd Dist. Hancock Nos. 5-10-34, 2011-Ohio-1458. The child's health and safety is paramount in determining whether reasonable efforts were made. *In re R.P.*, 5th Dist. Tuscarawas No. 2011-Ohio-5378.

{¶77} R.C. 2151.419 requires the trial court to determine whether the agency filing the complaint for custody "has made reasonable efforts * * * to eliminate the continued removal of the child from his home, or to make it possible for the child to return home." Subsection (B)(1) mandates the trial court to issue written findings of fact setting forth the reasonable efforts made by the agency, including a brief description of "the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from his home or enable the child to return home."

{¶78} However, even where a trial court has failed to include in its judgment entry, the findings contemplated by R.C. 2151.419(B)(1) we have found that the ultimate issue is the reasonableness of the Department's efforts, and have concluded those efforts may be determined from the record. *In the matter of Kell/Bess Children*, 5th Dist. No. 97CA0278, 1998 WL 401767(Mar. 23, 1998); *Hunt v. Ickes*, 5th Dist. Tuscarawas No. 2014 AP 08 0032, 2015-Ohio-309, ¶19

{¶79} We find there is competent and credible evidence to support the trial court's determination that RCCS efforts were reasonable and diligent under the circumstances of the case.

{¶80} The trial court found that neither parent has made significant progress on the case plan. The trial court found that RCCS filed a case plan. RCCS did make referrals. Father's attempt at counseling fails to even address the reasons the children have been removed from the home. Father did not present any evidence that he is addressing his own mental health issues in any type of counseling.  Father did not complete anger management.

{¶81} The record makes clear Father refuses to accept any responsibility for the children's poor behavior and instead blames RCCS and Mother. The record is clear that Father does not believe he needs help and that he did nothing wrong.

{¶82} We find that the record supports that RCCS was working toward the goal of reunification. We find no evidence of dishonest purpose, conscious wrongdoing, or breach of duty on the part of RCCS.

{¶83} Having reviewed the record, we find that RCCS made a good faith effort to reunify Father and his children. Furthermore, the record contains clear and convincing

evidence to support the court's determination that the children could not be placed with Father.

## The Best Interest of the Children

{¶84} An agency that seeks permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re B.C.,* 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. R.C. 2151.414(D)(1) sets out a non-exhaustive list of factors the court must consider:

{¶85} R.C. 2151.414(D) requires the trial court to consider all relevant factors in determining whether the child's best interests would be served by granting the permanent custody motion. These factors include but are not limited to: (1) the interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) apply.

{¶86} The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated.

{¶87} No one element is given greater weight or heightened significance. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816. R.C. 2151.414(D)(1) does not

require a juvenile court to make specific findings regarding each best-interest factor listed in R.C. 2151.414(D)(1) or to include in its decision or judgment entry a written discussion of each of those factors. *In re: A.M.,* Slip Opinion No. 2020-Ohio-5102, 2020WL6439610 (Nov. 3, 2020). ¶33.

{¶88} A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), *citing In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

{¶89} We conclude that the juvenile court's judgment entry demonstrates that the court complied with R.C. 2151.414(D)(1).

{¶90} The trial judge specifically found that it was in the children's best interest to award permanent custody to the department. The juvenile court judge also individually cited each of the factors set out in R.C. 2151.414(D)(1)(a) through (e), in language tailored to the facts of this case. The trial judge noted each child's wishes, the child's difficulties in foster care placement, and the interrelation of the siblings to each other. Ultimately, the trial court came to the difficult decision that the wishes of the children are at odds with their best wishes. After over two years, Father has steadfastly refused to accept responsibility or to set about the task of becoming a loving, nurturing parent capable of modeling the type of safe, calm and productive behavior that the children need. Nothing

in the record before us demonstrates that more time or a return of custody to the Father will in any way benefit the children.

{¶91} The trial court differentiated Father's care for his 4-year old child from a subsequent relationship, "He is providing adequate, loving care for his 4-year-old daughter. She was born of a relationship with another person. He is providing this care alone. One of the crucial elements of the harm the older children have suffered was the presence of significant conflict between the father and mother during the earlier years of the older children. The [4- year old] does not appear to have suffered from that conflict. She is quite young and is not surrounded by out-of-control siblings. She also has not entered into the period of her teen years."

{¶92} In the present case, the trial court concluded the children's need for legally secure placement could not be achieved without awarding permanent custody to RCCS. Upon review of the record, the record supports the trial court's finding that granting the motion for permanent custody is in the children's best interest.

{¶93} In short, the juvenile court's judgment entry demonstrates that the court satisfied its statutory duty to consider the best interest factors set out in R.C. 2151.414(D)(1)(a) through (e).

## Conclusion

{¶94} For these reasons, we find that the trial court's determination that Father had failed to remedy the issues that caused the initial removal and therefore the children could not be placed with him within a reasonable time or should not be placed with him was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence. We further find that the trial court's decision that permanent

custody to RCCS was in the children's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶95} Because the evidence in the record supports the trial court's judgment, we overrule Appellant-Fathers First Assignments of Error.

II.

{¶96} In his Second Assignment of Error, Father contends the trial court did not have jurisdiction to terminate his parental rights with respect to Child 1. Specifically, Father contends that she was adjudicated as a delinquent child and not an abused, neglected or dependent child.

**Standard of Appellate Review.**

{¶97} We review de novo as a question of law whether a court has subject-matter jurisdiction. *Cirino v. Ohio Bur. of Workers' Comp.,* 153 Ohio St.3d 333, 2018-Ohio-2665.

**Issue for Appellate Review***: Whether the juvenile court had jurisdiction to grant permanent custody of Child 1 to RCCS*

{¶98} R.C. 2152.19 Additional disposition orders for *delinquent children* states, in relevant part,

(A) *If a child is adjudicated a delinquent child*, the court may make any of the following orders of disposition, in addition to any other disposition authorized or required by this chapter:

(1) *Any order that is authorized by section 2151.353 of the Revised Code for the care and protection of an abused, neglected, or dependent child;*

Emphasis added. R.C. 2151.353 Disposition of abused, neglected, or dependent child provides, in relevant part,

> (A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

> * * *

> (2) *Commit the child to the temporary custody of any of the following:*

> (a) A public children services agency;

> * * *

> (4) *Commit the child to the permanent custody of a public children services agency or private child placing agency*, *if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child.* If the court grants permanent custody under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding.

Emphasis added.

{¶99} In the case at bar, Child 1 was adjudicated a delinquent child. R.C. 2152.19(A)(1) clearly gives the juvenile court the authority to grant permanent custody of Child 1 to RCCS "if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's

parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child." R.C. 2151.353(A)(4). In the case at bar, the procedural course of the delinquency case mirrored the procedural course of the dependency cases for Child 2, Child 3 and Child 4.

{¶100} In the case at bar, a detention review hearing in Child 1's case took place on July 16, 2019. Court Exhibit B. RCCS was given temporary custody of Child 1 by Judgment Entry filed July 16, 2019. Id. R.C. 2152.19(A)(1); R.C. 2151.353(A)(2). The magistrate found that RCCS was to be given temporary custody as an interim order; that RCCS had made reasonable efforts to prevent Child 1's removal from the home, and it was in the best interest of Child 1 to be placed into the custody of RCCS. Court Exhibit B.

{¶101} On October 10, 2019 the case was before the trial court for trial on the delinquency complaint. Court Exhibit B. Child 1 was place under Community Control Sanctions until age 21 unless earlier discharged by the court; given probation, and placed in the temporary custody of RCCS. Court Exhibit B, *Magistrate's Decision and Judgment Entry*, filed October 10, 2019 at Exhibit A; Exhibit B. The juvenile court again found that RCCS had made reasonable efforts to prevent Child 1's removal from the home, and it was in the best interest of Child 1 to be placed into the custody of RCCS. Court Exhibit B. *See,* R.C. 2151.419(A)(1).

{¶102} Similar to the cases involving each of the other children, RCCS filed a Case Plan in the delinquency case on September 30, 2019 with the goal of reunification of Child 1 with her family. Court Exhibit B, *Magistrate's Decision* filed November 19, 2019 at

Exhibit A. *See,* R.C. 2151.412. Father did not object to the Case Plan and the juvenile court noted all parties were in agreement with the Case Plan. *Magistrate's Decision* filed November 19, 2019. Therefore, the juvenile court approved and adopted the Case Plan. Id.

{¶103} The Father filed a motion for an in-camera interview by the juvenile court with Child 1 to ascertain Child 1's wishes with respect to custody and visitation. Court's Exhibit B, *Magistrate's Order,* filed Mar 11, 2020. The magistrate denied the motion finding that the court had appointed a guardian ad litem and Child 1 had a probation officer both of whom reported to the court concerning the child's wishes and welfare. Id. The magistrate found no evidence that Father "has improved his ability to provide adequate living arrangements for the minor and siblings, regarding visitation, efforts are already being made to increase and stabilize visitation arrangements..."

{¶104} On August 10, 2020, a hearing took place on Father's motion for temporary custody filed Mar 6, 2020 and RCCS's motion to extend temporary custody. *See*, R.C. 2151.415(D)(1). At the hearing, Father withdrew his objections and agreed to extend temporary custody of Child 1 with RCCS. Court's Exhibit B, *Magistrate's Decision,* filed Sept 14, 2020. The magistrate further found that RCCS had made reasonable efforts to avoid removal of Child 1 from the home and is making reasonable efforts to finalize a permanency plan. Id. *See,* R.C. 2151.419(A)(1).

{¶105} Father has failed to specifically detail or argue how either his procedural or substantive due process rights were violated by the procedure that was followed by the juvenile court in the delinquency case as opposed to the dependency cases involving Child 2, Child 3, and Child 4. RCCS filed a Motion for Permanent Custody involving all

four children in accordance with R.C. 2151.413. The notice given Father contained a full explanation that the granting of permanent custody permanently divests the parents of their parental rights, a full explanation of their right to be represented by counsel and to have counsel appointed pursuant to Chapter 120. of the Revised Code if they are indigent, and the name and telephone number of the court employee designated by the court pursuant to section 2151.314 of the Revised Code to arrange for the prompt appointment of counsel for indigent persons. R.C. 2151.414(A)(1); Juv.R. 15.

{¶106} Father attended and was represented by counsel at the sole permanent custody hearing involving all four children that spanned several days.  Father's counsel cross-examined the witnesses presented by RCCS. Father was able to argue, and present testimony and evidence to demonstrate his contention that RCCS did not make reasonable efforts to reunify him with Child 1, Child 2, Child 3 and Child 4; that Father completed the Case Plan objectives; Father had alleviated the conditions that caused Child 1, Child 2, Child 3 and Child 4 to be removed from his home; and that it was not in any of the children's best interest that permanent custody be granted. As there was only one proceeding, Father exercised these rights in each of the four cases involving his children in the same manner. Father fails to specify or elucidate how he or Child 1 suffered any prejudice or a violation of his or Child 1's rights based upon the fact that Child 1 was adjudicated delinquent rather than abused, neglected or dependent.

{¶107} As set forth in our disposition of Father's First Assignment of Error the juvenile court found Child 1 cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and that the permanent commitment is in the best interest of the child.  R.C. 2152.19(A)(1); R.C. 2151.353(A)(4).

{¶108} Father's Second Assignment of Error is overruled.

{¶109} The judgment of the Richland County Court of Common Pleas, Juvenile Division is affirmed.

By Gwin, P.J.,

Delaney, J., and

Baldwin, J., concur